## VITO GARELLO v. THE STATE.

### No. 7634.   Decided June 4.

**1. Murder—Argument of Counsel Abuse of.**—Upon a trial for murder, in his closing argument, the district attorney used the following language, viz.:   "He (defendant) is from the sunny clime of Italy, where the *Mafia* flourishes and the people band themselves together for the purpose of committing wholesale murder."   To which defendant excepted.   *Held*, that while the language was evidently intended to excite race prejudice, and was improper, it is hardly to be supposed that it could injure defendant before a jury of ordinary intelligence, and especially in a case where both parties, deceased and defendant, were Italians.

**2. Same—Practice as to.**—In order that abuse of argument may constitute ground for reversal, upon appeal, it must be made to appear that counsel for defendant called upon the court to repress the counsel as soon as the objectionable remarks were made, and requested the court to instruct the jury that they were not to be influenced thereby, and that the court refused such request, and that defendant reserved a bill of exceptions.

**3. Charge of Court—Self-Defense.**—Where the court instructed the jury, "if the deceased pursued and overtook defendant, and defendant, believing that deceased was about to take his life, or inflict serious bodily injury upon his person," killed the deceased, he would not be guilty.   Upon objection that the charge was too restrictive, and made defendant's right of self-defense depend upon his being pursued and overtaken, and did not allow defendant to turn and advance to meet the danger, *held*, that such objection was not maintainable when in other portions of said paragraph of the charge the jury were instructed, in effect, that "if the acts of deceased, or his acts coupled with his words, made it reasonably appear to defendant that deceased was about to take his life, or inflict serious bodily injury, he is not guilty."

**4. Special Requested Instructions.**—It is not error to refuse special requested instructions where the points embraced in such instructions are covered by the charge of the court.

**5. Self-Defense—Superiority of Strength.**—Where the court refused
to charge the jury directly that they could look to the great superior strength
of deceased as an element to be considered in defendant's right of self-defense,
but did charge them that " they were to look at the surroundings from the stand-
point of defendant," *held*, that this was sufficient.

**6. Exception to the Charge to be Taken, when—Not in Time
After Verdict.**—The object of excepting to the charge is to give the trial
judge an opportunity of revising his charge before the verdict is returned, and
no general exception to the charge, or exception upon grounds suggested after
verdict, will meet the requirement of the statute (Code Crim. Proc., art. 685),
with regard to errors in the charge excepted to at the time of trial.

**7. Evidence Insufficient.**—See the *opinion for evidence held wholly in-
sufficient*, in the opinion of the majority of the court, to support a conviction
for manslaughter. Davidson, J., dissenting, and holding that the evidence is
sufficient, and that the judgment should be affirmed.

APPEAL from District Court of Hunt. Tried below before Hon. E. W.
TERHUNE.

Under an indictment charging him with the murder of one Sylvester
Alfino, appellant was, at his trial, convicted of manslaughter, his punish-
ment being affixed at two years imprisonment in the penitentiary.

Under instructions from Judge Davidson, in his dissenting opinion, we
reproduce in full the evidence as found in the statement of facts in the
record.

Charles Muzzio, the first witness for the State, testified: I run a restau-
rant in Greenville, Hunt County, Texas. I am acquainted with the de-
fendant, Vito Garello, and was also acquainted with Sylvester Alfino in
his lifetime. Sylvester Alfino is dead; the defendant killed him by stab-
bing him with a knife, on the night of the 28th of November, 1891. They
were both at work for me at the time. I first met Alfino in Dallas, about
four months prior to that time, and engaged him to come to Greenville
to cook for me; and when he came he brought the defendant with him,
and they worked for me for about three months before Sylvester was
killed. Sylvester was cook, and defendant was dishwasher. They were
both Italians, and came from Oklahoma Territory here. I am an Italian,
but they do not speak my language exactly, though we could understand
each other. Sylvester could talk English, but defendant can not, but
only a few words. I was present at the time of the killing; it occurred
in my house, in the hall, between the cook and dining rooms, in Green-
ville, Hunt County, Texas.

My premises are on the north side of the square, and my dining room
next to the square, and the hall runs due north from the dining room
into the kitchen. The deceased came in from the saloon, through the
hall leading from the dining room into the kitchen, where myself, John
Miller, and Dave Davis and defendant were, and said something to de-
fendant, who was sitting in the southwest corner of the cook room, near

the stove.   They had been drinking, and Sylvester was so full I was cooking Davis' supper.   I do not remember what it was, and defendant replied something, and deceased ran to him, and knocked him, or pushed him, out of the chair down in the corner of the house, and was on top of him, and myself, Dave Davis, and John Miller pulled him off, and pulled him away from defendant; and when defendant got up, I told them I would not permit that, and he remarked that he intended to go and have Alfino arrested, and started out through the hall, and had got into the hall, going out, when deceased told him to go if he wanted to, that he had plenty of money with which to pay his fine, and defendant stopped and turned round, and deceased took after him and run on to him in the hall, and as he came, defendant stuck a knife in deceased, and he died the next day.   Deceased prior to that time told me that he wanted me to discharge defendant; that they had some partnership property in Guthrie that he wanted him to go and attend to.   Deceased had been trying to get defendant to leave several days, and they had been wrangling about it.   I refused to discharge the defendant, and so informed deceased.   He said he wanted me to discharge him so he would go back to Oklahoma, and look after their property.

Cross-examined by defendant:   The deceased was a much larger man than the defendant.   The deceased would weigh about 180 or 190 pounds; . was about 30 years old, and was well built, and strong and active.   The defendant only weighed about 110 or 120 pounds.   I did not see either of the parties with knives; it was all done very quick.   I was not noticing very particularly right at the time, or I could have stopped it.   I do not know the general reputation of deceased for peace and quietude.   I never saw anybody that ever saw or heard of deceased before he came here, except the defendant.   He came here from Oklahoma about three months ago.   The defendant and deceased had been quarreling some that night, about defendant not leaving.   I had given deceased a dime a short time before with which to buy beer, and they had taken a drink.

There is a door leading from the hall into the saloon.   Deceased was cutting up so, I was cooking Davis' supper myself.   I did not pay much attention to them at the start, as they had been fussing some time, but when they got into the row, after deceased came out of the saloon the last time, when defendant was sitting in the kitchen, I told them I would not allow that.   Defendant stood a moment, and started out to the hall, saying he would get a policeman and have Alfino arrested.   I did not see Alfino have any weapon at all.   I did not see defendant get the knife. There were some shelves by which he was standing.   The knife he stabbed deceased with was a bread knife I made myself.   It was about an inch wide at the handle, and pointed like a dagger, and about ten inches long. Defendant only stabbed him once.   The knife went into his stomach,

straight in, up to the handle. Alfino said he was killed, and defendant left. Alfino died next day.

John Miller, second witness for the State, being sworn, testified as follows: I am acquainted with the defendant, Vito Garrello, and was acquainted with the deceased. I was present at the time that the defendant killed the deceased. I was clerk for Muzzio at the time. The deceased came in the kitchen through the hall from the saloon, and at the time defendant was sitting down in a chair in the southwest corner of the cook room, and deceased said something to defendant, and defendant replied something to deceased in Italian. I did not know what it was, and deceased ran on to him, where he was sitting in the chair, and either knocked him down in the corner of the room, or pushed him down, I do not know which, and got on him. The big Italian, and a dishpan that was on the shelf in that corner, and a box of cracker meal were all on the little Italian. The dishpan and meal were accidentally knocked down in the scuffle, in the corner of the house, when Charley Muzzio, Dave Davis, and myself pulled him off.

The hall entrance into which deceased came, as above spoken of, is in the southeast corner of the cook room, and the entrance of the cook room at that place was a short distance, only the width of the room, from where defendant was sitting; there was no door to the hall, it being all the way from the dining room to the kitchen the same size. The east wall of the building constitutes the east wall of the kitchen, dining room, and hall, and a saloon adjoined on the west.

After Davis, Muzzio, and myself pulled the deceased off, defendant waited a minute and remarked that he was going to get a policeman and have deceased arrested, and started off and got a few steps up the hall, and the deceased said something to him in Italian and started after him. Just on the inside of the hall there was a carving table, and defendant picked up a knife that was upon the table, and as deceased came at him, I think he, defendant, turned and made a step or two toward deceased, and as the deceased came at him defendant stuck the knife in him, and deceased died the next day. The deceased was cut with the knife kind of in the side, and died next day. I did not see Alfino have any weapon. I noticed a black eye on defendant in jail a few days after the killing, which, I suppose, deceased gave him.

Cross-examined: The deceased was a larger man, weighing about 180 pounds, and the defendant was a small man, only weighing about 120 pounds. I did not see defendant pick up the knife. He stopped just opposite some shelves in the hall and turned and made about one step toward deceased, as deceased came on to him, and stuck the knife into him.

Joe Galbreath, witness for the State, being duly sworn, says: I am deputy sheriff of Hunt County, Texas. Defendant was arrested by me at Celeste, about midnight of the day of the killing. I am satisfied that he

walked to Celeste that night. Celeste is about thirteen miles northwest of Greenville. He had neither hat nor coat on at the time.

Dave Davis, first witness for the defendant, being duly sworn, says: I was present on the night that the defendant Vito Garrello killed Sylvester Alfino. I came in on the 10 o'clock train that night, and went to Muzzio's to get some supper, and was in the kitchen at the time when deceased came into the kitchen. Deceased came in, kind of cursing the saloon-keeper for not selling him some beer on a credit, and slapped himself on the breast, and stated that he had plenty of money, and muttering something, in Italian, that I could not understand; seemed to be pretty full. The defendant, at this time, was sitting in the corner of the house, next to the stove, cross-legged, and deceased said something to him in Italian, and defendant replied in Italian, and the big Italian, the deceased, ran at defendant, and knocked him down in the corner of the house, and got on him, and Muzzio and myself and John Miller pulled him off, and separated them, and I took hold of the little one, and told him that I would arrest both of them and take them to the police if they went to fighting there. Defendant replied to me, and says, "Me got no money to pay fines with," and says, "Me going to have him arrested," and started from near the stove, and as he went into the hall the deceased struck at him and missed him, and then kicked him a glancing lick that knocked the defendant nearly around, and defendant turned on around, and stuck the knife in deceased, and then ran on out. Deceased died the next day.

Cross-examined: I went out and tried to find the defendant, but he was gone.

Vito Garello, the defendant, being sworn in his own behalf, testified, through an interpreter: I am the defendant in this cause. Have been acquainted with deceased Sylvester Alfino. Have been acquainted with him for about two years. He and I became acquainted in the city of Guthrie, about two years ago, and have been working together a good portion of the time since. We own some property together in the city of Guturie. I weigh 110 pounds, and deceased weighed 190. We frequently weighed together. We were very close friends at the time of the killing. We were at work for Mr. Muzzio. He was the cook, and I was the dishwasher. I was not acquainted with any other man in Texas when I came here, and he and Mr. Muzzio were the only men that I could talk with that I knew of in Texas, at that time. Deceased could talk English better than I could. On the night of the tragedy deceased had been out somewhere, and came into the cook room, where I was sitting down in a chair in front of the stove, and he told me to get up and give him that chair, and I told him that I would not do it; that I had as good right to the chair as he had. He said he killed one man in Italy, and will kill another; "I will split you open like a dirty hog;" and deceased ran at me and knocked me down in the corner of the house, and

went to choking me, and Muzzio and Davis pulled him off. He struck me near the eye and made it black, and after they pulled him off, I told them that I was going after an officer to have him arrested, and had gone some little distance, and as I entered the hall going out, he ran and struck me again and knocked (me) against the table, and it happened there was a knife on the table, and as he came at me after he knocked against the table I hit him with the knife; as he came at me, without a moment's thought, I grabbed the knife and stabbed him.

Cross-examined: I am a native of Italy. I have been in the United States ten years. The deceased told me he had killed one man in Italy, and would kill another here; that he would split me open like a hog. When I stabbed him I did not have any hat or coat on, but had on my apron. I went out the back door and pulled the apron off and left. I had no acquaintances in Texas. I went from Kansas City to Oklahoma.

Will Velvin, a witness for the defendant, says: I am city marshal of the city of Greenville. I saw deceased but a few minutes before he was killed. He was in Fletcher's saloon, pretty full, and was making considerable fuss, and seemed to be in a row with Fletcher because Fletcher would not credit him for a drink. I told him that I would arrest him if he did not behave, and Muzzio came and got him, and very few minutes afterward I learned that he was killed.

*J. G. Mathews*, for appellant.

No brief on file for the State.

SIMKINS, Judge.— Defendant was convicted of manslaughter, and sentenced to two years in the penitentiary, and appeals to this court.

1. The first error assigned is, that the court erred in permitting the district attorney to use the following language: " He (referring to defendant) is from the sunny clime of Italy, where the Mafia flourishes, and the people band themselves together for the purpose of committing wholesale murder."

This language was improper. What bearing the Mafia had upon this case is not apparent from the evidence, and reference to it was intended to excite race prejudice, or it had no meaning. But, conceding such to be the intention, it is hardly to be supposed that statements of such a character would injure defendant before a jury of ordinary intelligence, and especially in a case like the one at bar, where both parties engaged in the difficulty were Italians; the only difference being, defendant was a small, and deceased was a large Italian.

But it is to be regretted the district judge did not hear the remark, so as to have stopped the State's counsel. As he did not, it devolved upon the defendant to call the attention of the court to the language, and re-

serve an exception thereto, and also request instructions directing the jury to disregard the unauthorized statement of counsel for the State. This was not done. Mason's case, 15 Texas Ct. App., 534; Jackson's case, 18 Texas Ct. App., 586; Young's case, 19 Texas Ct. App., 543; Kennedy's case, 19 Texas Ct. App., 633.

2. Defendant excepted to the charge on self-defense as being too restrictive. The court charged, "If the deceased pursued and overtook defendant, and defendant, believing that deceased was about to take his life, or inflict serious bodily injury upon his person," killed the deceased, he would not be guilty. That by the charge the court made the defendant's right of self-defense to depend on his being pursued and overtaken, and did not allow defendant to turn and advance to meet the danger.

We think the objection fully met by the other portions of paragraph 11, to the effect that if the jury find "that the acts of the deceased, or his acts, coupled with his words, made it reasonably appear to defendant that deceased was about to take his life, or inflict serious bodily injury, he is not guilty."

3. The court did not err in refusing the special charge asked by defendant. The third portion of paragraph 11 covered all the points in the special charge that should have been given. The court refused to charge directly that the jury could look to the great superior strength of the deceased as an element to be considered in defendant's right of self-defense—still he charged the jury, "they were to look at the surroundings from the standpoint of defendant." This was sufficient. Again, it appears from the bill of exceptions, that there was no objection made or exception taken to the charge until after the verdict of the jury. The object of excepting to the charge, as stated in Bishop's case (43 Texas, 390), is to give the trial judge an opportunity of revising his charge before the verdict is returned, and no general exception to the charge, or exception upon grounds suggested *after* the verdict, will meet the requirement of the statute to except at the time of trial. Code Crim. Proc., art. 685; Phillips' case, 19 Texas Ct. App., 158; McCall's case, 14 Texas Ct. App., 453; Bogan's case, 30 Texas Ct. App., 466.

4. The fifth assignment of error presents the most serious question, "the insufficiency of the evidence."

Two Italians had been together for several years; they owned property in common, and at the time of the difficulty were working together in a restaurant at Greenville. That day deceased had been drinking heavily, and at night came into the room where his employer and others were sitting, and where also defendant was seated near the stove. Deceased approached defendant and ordered him to get up and give him the chair. Defendant refused, and deceased at once knocked him down, or pushed him out of the chair into the corner of the room, and got down upon him and was choking him when the bystanders interfered and pulled him

off. Deceased was a strong, robust man, greatly exceeding defendant in size and strength, weighing 190 pounds, defendant weighing 110 pounds. One of the witnesses stated that the big Italian, a dish pan, and a box of crackers were all on the little Italian when lying in the corner; the latter two accidentally knocked down in the scuffle while pulling the deceased off the defendant.

On being released defendant, stating "he would get a policeman to arrest deceased," started out of the room through a hallway; deceased followed him and struck at him, and kicked him, turning him half around, and knocking him against a table whereon lay a large knife used for cutting bread. Defendant seized the knife, and turning about, stabbed deceased and killed him. Such are the facts as we gather them from the record.

To hold that an unprovoked brutal assault by one of great superior strength, who had already demonstrated his power and purpose to do great bodily injury, who was under the influence of liquor and reckless and angry, was pressing the assault, can not justify the assaulted party in resorting to the only accessible means of stopping it, is certainly infringing upon the inalienable right of self-defense. Penal Code, art. 572. We can not give our assent to this conviction, but will order a new trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, JUDGE, dissents.—The evidence is sufficient and sustains the conviction thereupon. I dissent from that portion of the opinion of the majority of the court reversing the judgment for want of sufficient evidence to support the conviction. The judgment should be affirmed. The Reporter will report the testimony.